UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTHONY GRIFFITH,<br><br>Defendant | Criminal Action No. 21-244-2 (CKK) |

**MEMORANDUM OPINION AND ORDER**
(March 8, 2023)

Defendant Anthony Griffith ("Defendant" or "Griffith") is charged with four misdemeanors in connection with his actions during the insurrection of January 6, 2021. Before the Court is his [96] Motion to Suppress Statements, on which the Court held an evidentiary hearing on February 3, 2023. At that hearing, the Government entered into the evidentiary record an audiotape of one of the challenged interviews and testimony by one of the interviewing Federal Bureau of Investigation ("FBI") agents. Defendant put on no evidence or testimony. Contradictorily, Defendant asks that the Court credit certain portions of the agent's testimony and discredit others in such a way as to infer that the agent impermissibly delayed Mirandizing Defendant. Additionally, Defendant argues that the circumstances of the interviews made Defendant's inculpatory admissions involuntary. Each argument is meritless. Accordingly, and upon consideration of the pleadings,[1] the evidentiary hearing, the relevant legal authorities, and the record as a whole, the Court **DENIES** Defendant's [96] Motion to Suppress Statements.

---

[1] The Court's consideration has focused on the following materials:

- Defendant's Motion to Suppress Statements ("Mot."), ECF No. 96;
- The Government's Opposition to Defendant's Motion to Suppress Statements ("Opp."), ECF No. 106; and
- Transcript of Motion Hearing ("Trans."), ECF No. 124.

1

## I.  FINDINGS OF FACT

The Court bases its findings of fact exclusively on the evidence and testimony presented at the February 3, 2023 evidentiary hearing.  In doing so, the Court considered the demeanor and behavior of the witnesses, the witness' manner of testifying, whether the witness impressed the Court as truthful, whether the witness impressed the Court as having an accurate memory and recollection, whether the witness had any motive for not telling the truth, whether the witness had a full opportunity to observe the matters about which they testified, and whether the witness had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case.  The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witness in determining whether to accept it as true and accurate, as well as whether the testimony was contradicted or supported by other credible evidence.  The Court has also considered the pleadings and, more generally, the entire record in this case.

One witness testified during the evidentiary hearing:  Special Agent Jeffrey Gardner of the FBI for the Government.  Defendant put on no evidence or testimony.  Special Agent Gardner's testimony and the exhibits in the record are therefore unrebutted.

Special Agent Gardner testified that he, although with his supervisory agent, executed a warrant issued for Defendant's arrest in connection with this case.  Trans. at 24:19-23.  Defendant was arrested on March 4, 2021 at approximately 6:30 AM in Muskogee, Oklahoma.  *Id.*  Pursuant to a plan devised by Agent Gardner's superiors, four law enforcement officers spread across three FBI vehicles stopped Defendant while he was driving in the parking lot of a hospital where he was working at the time.  *See id*. at 17:8-14 (plan and hospital); 18:9-13 (number of vehicles).  At the

---

Defendant did not file a reply in support of his Motion.

time of the stop, Defendant was in the driver's seat and an associate was in the passenger's seat. *Id.* at 59:6-12. The stop was initiated when the first vehicle, driven by a local police officer detailed to the FBI, activated its emergency lights. *Id.* at 18:5-6. Agent Gardner then exited the passenger side of his vehicle, which was also positioned closer to the passenger side of Defendant's vehicle, approximately thirty feet away from Defendant's vehicle. *Id.* at 21:7-9; 59:6-12 (distance). Agent Gardner wore a green ballistic vest emblazoned "FBI," over which he wore a blue "FBI" "raid jacket." *Id.* at 19:18-20:3.

Unlike the three other law enforcement officers, Agent Gardner drew his sidearm from his thigh holster (also known as a drop leg holster) on his right leg and presented it at the vehicle. *See id.* at 55:11-13. Agent Gardner immediately saw that no other officer had drawn their sidearm, so he quickly re-holstered it. *Id.* at 54:20-23. It is unclear whether Defendant could have seen Agent Gardner with a weapon drawn when Defendant exited his vehicle. *See id.* at 62:6-18. The third vehicle was angled to face the driver's side door of Defendant's vehicle, though not specifically to prevent Defendant from fleeing during the stop. *See id.* at 60:12-61:5.

After another law enforcement officer placed Defendant in handcuffs, Defendant was immediately placed in Agent Gardner's vehicle. *See id.* at 94:5-8. At approximately 6:38 AM, eight minutes after Defendant was placed in Agent Gardner's vehicle, Agent Gardner and his supervisory agent then began to transport Defendant to his home where additional law enforcement officers were executing a search warrant. *See id.* at 97:9-11. Agent Gardner testified that, shortly before commencing that trip, he Mirandized Defendant, *id.* at 22:13-22, a fact that Defendant did not contest in a subsequent interview, Gov. Ex. 5 at (recorded custodial interview). This assertion went unrebutted by any testimony, evidence, or proffer at the evidentiary hearing. Because Defendant was handcuffed at the time, with his hands behind his back, he did not sign an "advice

3

of rights" form used by the FBI to provide further documentary support when a defendant might argue that they had not been Mirandized. *See id.* at 25:3-19, 26:11-12. Rather, with Defendant seated in Special Agent Gardner's vehicle and facing Special Agent Gardner, who was standing, Special Agent Gardner merely read from that form and confirmed that Defendant understood his rights and nevertheless waived them. *Id.* at 25:19-21. Throughout the first interview, Defendant was genial, friendly, and cooperative, readily answering questions. *Id.* at 30:6-11.

This first interview ended upon arriving at Defendant's home, lasting approximately thirty-five minutes. *Id.* at 34:22-23. While there, Defendant complained that the handcuffs were exacerbating an extant shoulder injury, so law enforcement reaffixed the handcuffs such a way that his hands were at the front of Defendant's body. *Id.* at 38:10-14. Another law enforcement agent offered him a donut. *Id.* at 38:14-16. Defendant continued to be amiable and did not appear fearful. *Id.* at 39:18-24, 103:1-7. At some point, Special Agent Gardner and his supervisor officer asked if Defendant would be willing to speak to them again. Defendant agreed, and they led Defendant to their vehicle, parked in Defendant's driveway. *Id.* at 40:4-25.

That interview was recorded, and Defendant and the agents signed the advice-of-rights form. Gov. Ex. 5; Gov. Ex. 2. During this interview, Special Agent Gardner sat in the left, rear passenger seat and Defendant sat in the right, rear passenger seat, such that Special Agent Gardner's holstered sidearm was clearly visible during the interview. *See* Trans. at 45:18-23. The supervisory officer sat in the front seat. *Id.* This interview commenced at approximately 7:55 AM, around one-and-a-half hours after Defendant's arrest. *See id.* The second interview ended approximately twenty-one minutes later. *Id.* Defendant was handcuffed with his hands in front of him during this interview. He was not otherwise restrained, and was amiable throughout. Gov. Ex. 5. Again, he never corrected or questioned the agents' assertion during this interview that he

4

had previously been Mirandized, waived his rights to silence and an attorney, and had already answered questions during that interview. *Id.*

It should be noted that Defendant was about fifty years-old at the time of the arrest and a self-employed contractor and electrician with his own business and at least one employee. *Id.* at 36:1-37:2. During both interviews, Special Agent Gardner perceived no language barrier, cognitive issues, or intoxication. *Id.* at 35:13-24.

## II.  DISCUSSION

*First*, Defendant was clearly Mirandized before the first interview. It is the Government's burden to show by a preponderance of the evidence that a defendant was Mirandized and that he nevertheless knowingly, intelligently, and voluntarily waived his rights. *Colorado v. Connelly*, 479 U.S. 157, 168-89 (1986). Unrebutted testimony and Defendant's own statements during the second interview more than satisfy that burden.

*Second*, the facts here are a far cry from those constituting a coercive environment rendering statements post-*Miranda* warning "involuntary." The Due Process Clause forbids the admission of a confession "if under the totality of the circumstances it was involuntarily obtained." *United States v. Reed*, 522 F.3d 354, 358-59 (D.C. Cir. 2008). "The ultimate question is whether [a defendant's] will was overborne and his capacity for self-determination critically impaired as a result of [law enforcement's] conduct." *United States v. Hallford*, 816 F.3d 850, 857 (D.C. Cir. 2016) (internal quotation marks omitted and brackets altered). "Pertinent factors in this totality-of-the-circumstances analysis include the defendant's 'age, education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning.'" *United States v. Avitan*, 349 F. Supp. 3d 23, 31 (D.D.C. 2018) (quoting *United States v. Murdock*, 667 F.3d 1302, 1305-06 (D.C. Cir. 2012)). Particularly "'egregious facts [are] necessary to establish that

statements . . . made during questioning [are] involuntary[.]'" *Hallford*, 816 F.3d at 863 (Wilkins, J., dissenting in part and concurring in part) (brackets altered) (quoting *United States v. Mohamed*, 693 F.3d 192, 198 (D.C. Cir. 2012)).

None of Defendant's age, education, length of detention, or the nature of the questioning weigh in Defendant's favor. Defendant was approximately fifty years old and was a successful business owner. *Cf. United States v. Roberson*, 573 F. Supp. 3d 209, 221 (D.D.C. ) (twenty-seven years-old and a high school education weighed against a finding of involuntariness). The "interview[s] lasted an hour at most, [some] of which was spent engaging in friendly small talk with the agents." *See id.* (same). Even if the Court were to add the time spent in custody but not under questioning, such a time period is far from offensive. *E.g.*, *Mohammed*, 693 F.3d at 198 (two hours voluntary); *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) (four days voluntary). If, as defense counsel argued at the evidentiary hearing, Defendant "was truly so afraid as to have his will completely overborne by the [agents'] polite questions, he did an excellent job of hiding it." *See Roberson*, 573 F. Supp. 3d at 222. Based on the uncontroverted testimony of Agent Gardner and the tape of the second interview, the agents' questioning was "not the least bit aggressive in content, tone, or body language," *see United States v. Kelsey*, 917 F.3d 740, 751 (D.C. Cir. 2019), and the "tone of the interview was cordial" throughout, *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011).

There is nothing inherently coercive about a defendant seeing a law enforcement officer's sidearm during questioning; even Agent Gardner having briefly drawn his sidearm during the initial traffic stop is mild compared to the far more severe circumstances the Court of Appeals has held are not coercive. *E.g.*, *Yunis*, 859 F.2d at 961 (defendant locked in a "hot and cramped detention room" while suffering from seasickness); *Reed*, 522 F.3d at 358-59 (defendant claimed

to be suffering from withdrawal symptoms at time of interrogation and placed in jumpsuit without underwear). There are no facts here to suggest that the agents "threatened or injured [him] during the interrogation." *See Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010). As such, Defendant's statements were voluntary.

### III.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that Defendant's [96] Motion to Suppress Statements is **DENIED.**

**SO ORDERED.**

Dated: March 8, 2023

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge