UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANTHONY GRIFFITH,<br><br>Defendant. | Criminal Action No. 21-244-2 (CKK) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
(May 16, 2023)

A five-day bench trial in this criminal matter concluded on March 17, 2023. For his actions at the insurrection of January 6, 2021, the Government charged Defendant Anthony Griffith ("Defendant" or "Griffith") by Indictment with: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Indictment, ECF No. 12. In support of its case, the Government introduced testimony from four witnesses: (1) Captain Jessica Baboulis of the United States Capitol Police Department ("Capitol Police"); (2) Officer Stephen Nunn of the Capitol Police; (3) Agent Elizabeth Pratt of the Federal Bureau of Investigation ("FBI"); and (4) Agent Jeffrey Gardner of the FBI. Additionally, the Court admitted 93 exhibits into evidence.

At the close of the Government's case, Griffith moved for a judgment of acquittal as a matter of law. That motion remains pending before the Court. Griffith also presented evidence, calling three witnesses: (1) Thomas DiBiase, Esq., General Counsel for the Capitol Police; (2) Inspector Denea Newell of the Capitol Police; and (3) himself.

1

Based on the following findings of fact and conclusions of law, the Court **DENIES** Griffith's Rule 29 motion by separate order.

The Court finds Defendant Anthony Griffith **GUILTY** on Counts Two, Three, Four, and Five, the Government having carried its burden beyond a reasonable doubt as to each element of each charge.

In reaching a decision on the following findings of fact and conclusions of law, the Court has considered the pleadings, the record, testimony, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of or unreasonableness of the testimony, the probability or improbability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts, and exhibits in evidence. The Court credits the following testimony and evidence as undisputed and/or unrebutted.

### I.     Findings of Fact

A.   The Certification of the Electoral College Vote and the Insurrection Generally

Pursuant to the parties' [127] joint stipulation, the Court restates a number of background facts that it has found over the course of three prior bench trials, mainly predicated on the testimony of Inspector Lanella Hawa of the United States Secret Service ("Secret Service") and Captain Carneysha Mendoza of the Capitol Police in *United States v. Rivera*, Crim. A. No. 21-060 (CKK) (D.D.C.).

As Captain Baboulis also reiterated, the Capitol, guarded twenty-four hours a day, was open only to those with official business (along with Members and staff) from March 2020 to January 6, 2021. Had the Capitol been open to the public, all members of the public would be required to enter through the Capitol Visitor's Center. Additionally, aside from Members, anyone seeking to enter the Capitol must show identification, go through a metal detector, put

their belongings through an x-ray machine, and are otherwise subject to search by United States Capitol Police ("Capitol Police") officers. Were someone to enter the Capitol without passing through security, Capitol Police would work to find and detain that person; if necessary, Capitol Police would lock down portions of the Capitol in such a way that could include stopping certain Congressional proceedings.

In preparation for Vice President Michael R. Pence's visit to preside over the counting of the votes of the Electoral College on January 6, Inspector Hawa coordinated the Vice President's visit with the Capitol Police. In partnership with the Capitol Police, the United States Secret Service ("Secret Service") set up a protective perimeter around the entire grounds of the United States Capitol. Only those with credentials or with permission from either agency were permitted beyond that point. The security perimeter is standard for visits by heads of state (in which category the Secret Service includes the Vice President) but was also implemented in light of security concerns arising from then-President Donald J. Trump's scheduled "Stop the Steal" rally near the White House. At various places, the protected area had successive lines of barriers made of snow barriers, interconnected bike racks, or mesh fencing. Most of these barriers included at regular intervals "Area Closed" signs printed in large font. *See also* Gov.'s Ex. 414.

Inspector Hawa, as the head of the Vice President's coordinating detail at the United States Capitol, arrived at the Capitol building in the morning on January 6 to coordinate the Vice President's visit that day. Vice President Pence arrived approximately at 12:30 p.m. with his wife and daughter, and Inspector Hawa escorted the Vice President and his family to the Vice President's Ceremonial Office in the Capitol. The Joint Session for the count of the Electoral College votes began at 1:00 p.m. with Vice President Pence presiding. Fifteen minutes later, the

two Houses of Congress retired to their respective chambers to debate the certification of the votes from the state of Arizona.

After 1:15 p.m., which was fifteen minutes after the Vice President returned to the Senate, the Secret Service learned of breaches to its protective area, i.e., the mob had made its way through barriers and onto the Capitol grounds by that time. At that time, the Secret Service began to discuss moving the Vice President and his family to a more secure location. At around 2:30 p.m., when the rioters first breached the Senate side of the Capitol itself, the Secret Service evacuated the Vice President and his family to a more secure location in the Capitol. Shortly thereafter, with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed.

Although the Court has previously found that police barriers extended at least as far west as Peace Circle, Defendant put at issue the precise boundaries of the restricted area on January 6, 2021. In lieu of resolving that factual dispute, the Court merely notes that, before 1:00 PM that day, the entirety of the Capitol's West Front was surrounded by police barriers. Demonstrators began to breach that area at approximately 1:00 PM. At the time of these initial breaches, Captain Mendoza and other Capitol Police officers surged to support surviving police lines, mainly on the Upper and Lower Terraces on the West Front of the Capitol. MPD officers joined Capitol Police on these lines in stages. *See also* Gov.'s Ex. 414; 425. Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m. Just a few minutes later, the rioters smashed through the Senate Wing Door and its windows. Capitol Police officers briefly reclaimed the Senate Wing Door, only for rioters to overwhelm that line again at 2:49 p.m. Meanwhile, another door with access

4

to the Senate side of the Capitol, the Parliamentarian Door, was breached at 2:42 p.m.  For some period of time after 1:00 p.m. and before 2:42 p.m., MPD deployed chemical spray (pepper spray or something similar) to disperse the insurrectionists who had yet to join the portion of the riot that had captured the Upper West Terrace, ultimately to little effect.

When rioters entered the Capitol, they were met with a loud PA system urging Capitol visitors and staff to take shelter due to an incursion into the Capitol.  Although Capitol Police and Metropolitan Police Department officers engaged in hand-to-hand combat with the rioters to maintain portions of police lines throughout Capitol grounds, law enforcement was ultimately unsuccessful ultimately unsuccessful.  At that point, the focus of the Capitol Police shifted to convincing rioters to leave the Capitol and stemming particularly severe acts of violence.  Law enforcement and the National Guard were unable to secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later.  With Vice President Pence presiding, Congressional proceedings only resumed at approximately 8:00 p.m. when all of the rioters had been removed.

B.  <u>Griffith Participation in the Riot</u>

The Court finds that Griffith traveled by car from Oklahoma to the District of Columbia to attend what Griffith recalled to be the "Stop the Steal" rally.  Griffith was accompanied by a friend, Brent Vanamy, and Griffith's employee and apprentice electrician, Jerry Ryals (who pled guilty and whom the Court has since sentenced for his actions at the Capitol on January 6, 2021).  Griffith was excited to support then-President Trump and watch his speech in person.  Before leaving for the District of Columbia, and like then-President Trump, Griffith was also concerned about the legitimacy of the election.  Griffith observed the majority of then-President Trump's speech, in which then-President Trump baselessly claimed that the 2020 Presidential election had

5

been "stolen" and exhorted his followers to march to the Capitol to support then-President Trump's efforts to reverse the results of the election. At some point during or after the end of then-President Trump's address, Griffith began to march to the Capitol with Mr. Vanamy and Mr. Ryals. While marching to the Capitol, when the crowd's chants of "Stop the Steal" would quiet down, Griffith would encourage the crowd with yells of "Freedom!" He also heard others around him chant, among other things, "Stop the Steal."

It appears that the fencing that blocked public access to the West Front had been largely destroyed by the time Defendant arrived at the West Front at approximately 2:00 PM. By this time, Mr. Vanamy had left Griffith and Mr. Ryals. The Court finds, based on Griffith's location, his testimony, and photographic evidence, that Griffith would have observed a line of officers in riot gear attempt to keep the mob from advancing further onto the Lower West Terrace of the Capitol. *See, e.g.*, Gov. Exs. 302B; 509. He would have further understood at the time that police were using chemical munitions to keep the mob at bay. He also saw rioters climbing scaffolding that had been erected for the inauguration of then-President-elect Joseph R. Biden, Jr. *See* Gov. Ex. 319. While watching those rioters, he also listened as those around him chanted, among other things, "Our House!," "Drain the swamp!" and "We will not concede." *E.g.*, *id.*; Gov. Ex. 509.

As Mr. Ryals continued onward, Griffith followed. Eventually, Griffith joined Mr. Ryals on the Upper West Terrace outside of the Senate Wing Doors. While standing next to Mr. Ryals near the Senate Wing Doors, Defendant used his phone to film the mob, smiling at its size. Gov. Ex. 314. At the same time, Mr. Ryals observed that rioters had broken the windows adjoining the Senate Wing Door, and Mr. Ryals exclaimed, "We definitely have enough people to overthrow this bitch. They don't stand a fucking chance." *Id.* At some point, the two separated,

with Mr. Ryals moving northward to the Parliamentarian Door and Griffith moving eastward closer to the Senate Wing Door.

Upon arriving at the Senate Wing Door, Griffith observed others attempting to rip the door off its hinges (ultimately, successfully). Gov. Ex. 505. While doing so, "Stop the steal!" chants continued. *Id.* For the majority of his time directly outside of the Senate Wing Door, Defendant stood at the northern window, whose glass had been broken out. Gov. Ex. 403. Directly in front of him, two Capitol Police officers stood guard, one of whom held his baton in front of him as a sign to rioters that they were not authorized to enter the building. *Id.* At approximately 2:38 PM, and contrary to Defendant's testimony, Defendant can be seen shouting at a police officer inside the window, "Open the door." *Id.*

As rioters attempted to breach that door, another group of rioters successfully forced open the Parliamentarian Door. Gov. Ex. 505. Griffith immediately made his way to that door, passing another rioter cleaning what Griffith understood to be some sort of chemical spray out of that rioter's eyes. *Id.* Griffith continued onward, entering the Capitol building for the first time through the Parliamentarian Door at approximately 2:45 PM, Gov. Ex. 405, filming with his phone as he went, Gov. Ex. 505. As he entered, Defendant shouted with excitement.

After entering, and over a piercing alarm, *see* Gov. Ex. 316, Defendant turned right, into the Parliamentarian's Office, Gov. Ex. 404. The office, Defendant saw, was ransacked, with papers and furniture strewn about. *See* Gov. Ex. 501. After he exited, he briefly turned right to walk further into the Capitol, stepping on broken glass. Gov. Ex. 405. Evidently considering his path perilous, Defendant exited the building through the Parliamentarian Door, and then returned to the Senate Wing Door. *See* Gov. Ex. 507. Shortly before Griffith returned, rioters breached

the Senate Wing Door.  Gov. Ex. 403.  Defendant entered the Capitol through the Senate Wing Door at approximately 2:50 PM.  *Id.*

After entering, he saw and stepped over broken furniture directly in front of him.  *Id.*; Gov. Ex. 507.  Members of the mob continued to shout and protest all around him, featuring chants of, among other things "Traitors!" and "Fight for Trump!"  Gov. Ex. 507.  He briefly turned towards another line of riot police blocking the northern path to the Senate Chamber.  Gov. Ex. 403.  He then proceeded south, towards the Crypt.  *Id.*  In the Crypt, he reconnected with Mr. Ryals, where the two joined in chants of "USA!"  Gov. Ex. 504.  After remaining in the Capitol for some time longer, and only after law enforcement instructed Defendant to leave, Defendant exited through the Memorial Door at approximately 3:33 PM.  Gov. Ex. 413.

In general, Defendant maintained in his testimony that he thought it was lawful to enter and remain in the Capitol and its grounds until instructed otherwise.  The Court does not find this testimony credible.  As an initial matter, that assertion does not comport with clear video and photographic evidence of a variety of circumstances placing Defendant on notice that he was not permitted in the Capitol, not least of which included Defendant's admitted observation of chemical spray, an earsplitting alarm upon entering the Capitol, a ransacked office, broken glass, and that rioters had broken doors in order to enter the Capitol.  Given the numerosity of these signs that Defendant's presence in the Capitol was unauthorized, the Court does not credit Defendant's assertion that he thought it was lawful to enter and remain in the Capitol building.  Although Griffith testified that he was guided by firm religious convictions, particularly in regards to his views on abortion, those religious convictions do not negate the clear video and photographic evidence speaking to his intent to engage in political demonstrations in concert with the mob around him.

More specifically, Defendant contradicted his testimony at times in such a way as to call much of it into doubt. For example, Defendant initially admitted that he understood in broad strokes Congress' role in the certification of the election and that Congress was meeting on January 6, 2023. Trial Trans. 751:6-9. Later on, Defendant recanted, incredulously claiming, "I don't think I really realized——you know, the—Congress was there and all that." Trial Trans. 879:16-17. Defendant also selectively recalled certain exculpatory facts, but no inculpatory facts. For instance, the only statement Defendant could recall from the "Stop the Steal" rally was not, e.g., an eponymous exhortation to protest the results of the election, but then-President Trump speak "about his love for America and his love for the American people." Trial Trans. 744:9-11. Nor could Defendant recall, he testified, the many "Stop the Steal" chants around him throughout his time on Capitol grounds. *E.g.*, Trial Trans. 772:17-22. Although there are additional examples illustrating why the Court finds Griffith's testimony not credible, the Court shall stop here for the sake of brevity. Suffice it to say that the Court discounts any of Griffith's self-serving statements, finding only his inculpatory statements credible because they are supported by other evidence.

## II. Conclusions of Law

A. Count One

To find a defendant guilty of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), the Court must find the following beyond a reasonable doubt: (1) the defendant entered or remained in a restricted building without lawful authority to do so; and (2) the defendant did so knowingly. First, the Court concludes again that the Capitol building and area surrounding it were "restricted" within the meaning of 18 U.S.C. § 1752. Although Defendant placed at issue the precise boundary of the restricted area on January 6, 2021, the overwhelming weight of the evidence, including the testimony of members of the

Capitol Police, establishes that the West Front of the Capitol and the building itself were off limits to members of the public. *See United States v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021) (noting that there are a number of ways in which an area may become restricted). Second, the overwhelming weight of evidence shows that Defendant knew that he was not permitted on Capitol grounds or inside the Capitol well before a Capitol Police officer instructed him to leave.

Among myriad other signs Defendant witnessed that placed him on notice that his presence on Capitol grounds or inside the Capitol was unauthorized:

1. Defendant witnessed rioters scaling scaffolding in order to advance further onto Capitol grounds.

2. Defendant saw a line of police officers deploying chemical spray against rioters.

3. Defendant himself witnessed other individuals outside the Capitol building who, he understood, were suffering the effects of chemical spray.

4. Defendant observed rioters attempting to break down the Senate Wing Door, and he ultimately saw that rioters ripped the Senate Wing Door off its hinges.

5. Defendant first entered the Capitol through the clearly broken Parliamentarian Door.

6. Defendant witnessed a ransacked Parliamentarian's Office, in which furniture was toppled and papers strewn on the floor.

7. In order to advance further into the Capitol, Defendant saw and stepped over broken glass.

8. Defendant also saw a pile of destroyed furniture directly after entering through the Senate Wing Door.

*See Rivera*, 2022 WL 2187851, at *5 (discarded barriers, signs, pepper spray, alarm, and broken door at entry put defendant on notice that his presence was unlawful). As in *United States v. MacAndrew*, Crim. A. No. 21-730, 2023 WL 196132 (D.D.C. Jan. 17, 2023), the Court concludes that, if Defendant did not understand that his presence in and around the Capitol was unlawful, he willfully blinded himself to such knowledge. *See id.* at *6-7.

10

Accordingly, the evidence establishes beyond a reasonable doubt that (1) Griffith entered or remained in a restricted building without lawful authority to do so and (2) Griffith did so knowingly. The Court therefore finds Defendant **GUILTY** on Count 1.

B.  Count Two

To find a defendant guilty of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

As this Court has previously explained, even mere presence in an unlawful mob or riot is both (1) "disorderly" in the sense that it furthers the mob's disturbance to the peace and (2) "disruptive" insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants. Were it not, it must be said that continued presence in a mob that is being pepper sprayed by police, as a measure to control the rioters, is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area. Additionally, entering a Capitol building without authorization is necessarily "[n]ot according to order and rule," "unruly," and may "disrupt [Congressional] . . . activity" insofar as Capitol Police would seek out and detain anyone who enters a Capitol building without authorization. Accordingly, the Court concludes that Defendant engaged in disorderly or disruptive conduct in, or in proximity to, a restricted building.

Second, having discredited Defendant's testimony regarding his mental state, the Court presumes that he intended the natural and probable consequences of his actions. *See United States v. Grider*, --- F. Supp. 3d ---, 2022 WL 17829149, at *12 (D.D.C. Dec. 21, 2022); *United States v. Meija*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). "'The probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings.'" *Grider*, 2022 WL 17829149, at *12 (quoting *Rivera*, 2022 WL 2187851, at *5).[1] Even the presence of just *one* unauthorized person in the Capitol is reason to halt Congressional business as Capitol Police (and, in this case, many other law enforcement agencies) track down the intruder. *Id.* The natural consequences of Griffith's actions also align with the political sentiments expressed by the mob surrounding him to, among other things, "stop the steal" and "fight for Trump."

Third, as the Court explained in *Rivera*, even mere presence in these circumstances is in fact disruptive. 2022 WL 2187851, at *6. As noted above, even the presence of *one* unauthorized person in the Capitol is reason to suspend Capitol business. Captain Baboulis amply explained how Defendant's presence, standing alone, was disruptive to Congress and to the Vice President's business on January 6, 2021. Loudly chanting "USA" is also disruptive to Congressional business.

Altogether the Court finds that the evidence shows, beyond a reasonable doubt, that Griffith knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building that in point of fact impeded or disrupted the orderly conduct of

---

[1] *See also* ECF No. 81 at 397, *United States v. Brock*, Crim. A. No. 21-140 (JDB) (D.D.C. Dec. 6, 2022) (transcript of bench verdict); *United States v. Brock*, Crim. A. No. 21-158 (RC) (D.D.C. Oct. 27, 2022) (same).

Government business or official functions. The Court therefore finds Defendant **GUILTY** on Count 2.

C. Count Three

In order for the Court to find Defendant guilty of Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) the defendant acted willfully and knowingly. Broadly, a person acts "willfully" when they "act with knowledge that their conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (cleaned up); *see also United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring). As the Court has already concluded that Griffith knew his presence around and in the Capitol was unauthorized, and that his continued presence was disruptive, the Court has found that Griffith acted willfully as well.[2] For the other elements of the offense, for the same reasons the Court found Defendant guilty on Counts 1 and 2, the Court finds that the Government has carried its burden beyond a reasonable doubt and finds Defendant **GUILTY** on Count 3.

---

[2] In explaining why he chanted "USA" in the Crypt, Defendant testified that he did so as part of prayer, stating that "he was promot[ing] God's spirit[, b]ecause this country deserves God's word, and it's[] like the First Amendment." Trial Trans. 950:19-20. Insofar as Defendant maintains that he considered his actions religiously justified or constitutionally-protected, he nevertheless acted "willfully" to the extent he understood his actions to be in violation of law. *See United States v. Zeese*, 437 F. Supp. 3d 86, 98 (D.D.C. 2020) (trespass and protest); *see also Cheek v. United States*, 498 U.S. 192, 203-04 (1991) ("disagreement" with legal duties is not a defense to a crime requiring a mental state of "willfulness").

D. Count Four

To find a defendant guilty of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), the Court must find the following beyond a reasonable doubt: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and (2) the defendant acted willfully and knowingly.

As the Court has explained in prior opinions, "parading" and "demonstrating" centers on participation in a "march[,] procession," or gathering "in support of some political object" or question. *Rivera*, 2022 WL 2187851, at *7 (internal quotation marks removed). As an initial matter, and as this Court has already explained, even mere presence in a crowd of demonstrators suffices to protest, so long as there are some indicia that the defendant joined their fellow demonstrators' cause. *MacAndrew*, 2023 WL 196132, at *9. Here, however, Defendant in fact chanted "USA" while inside the Capitol, actually protesting. Defendant also admitted to chanting "Freedom" on his way to the Capitol and to attending the "Stop the Steal" rally. By these actions, the Court finds that Griffith intended his presence inside the Capitol to be an act of demonstration in concert with others. Second, for the same reasons the Court concluded that Defendant acted "willfully and knowingly" in Count 3, the Court concludes that the evidence shows, beyond a reasonable doubt, that Defendant "willfully and knowingly" "paraded [ or] demonstrated" "in any of the United States Capitol Buildings." The Court therefore finds Defendant **GUILTY** on Count 4.

#

#

#

#

### III. Conclusion

Beyond a reasonable doubt, Anthony Griffith knew on January 6, 2021 that his actions at the Capitol were unlawful. For his participation and actions at the insurrection of January 6, the Court finds Anthony Griffith **GUILTY** on Counts Two, Three, Four, and Five.

Dated: May 16, 2023

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge